## Jones v. Jones.

E. S. *Miller*, for libellant; *Saul, Ewing, Remick & Saul*, for respondent.

SMITH, J., Sept. 26, 1930.—The libellant filed her libel in the above court, to the above term and number, on Oct. 16, 1925, and filed her amended libel on May 11, 1927.

Paragraph 3 of her amended libel reads as follows: "At the time said marriage was contracted, the libellant was a citizen of the State of Pennsylvania and resided at No. 712 North Fifth Street in said state; and the respondent was a citizen of the State of Pennsylvania and resided at No. 1014 North Sixth Street in said state; immediately after their said marriage, the said libellant and respondent resided together at No. 1014 North Sixth Street in the State of Pennsylvania and have since resided at No. 1014 North Sixth Street, No. 1009 North Sixth Street in said City of Philadelphia and State of Pennsylvania, and at the corner of Roberts Road and Montgomery Avenue, Bryn Mawr, Pa., until within four years, during which, though libellant has retained her residence in Pennsylvania, she has had no place of continuing abode there, having been temporarily absent from this state.

"The present residence of the libellant is in Philadelphia in the Bellevue-Stratford Hotel in the State of Pennsylvania, and she has been a resident of the State of Pennsylvania for fifty-four years previous to the filing of this libel. The present residence of the respondent is the building of the Union League Club on west side of Broad below Chestnut Street in Philadelphia."

The ground alleged for the divorce is that the said Charles J. Jones, the respondent in this cause, from time to time since the time of their said marriage, by cruel and barbarous treatment endangered this libellant's life and offered such indignities to her person as to render her condition intolerable and life burdensome and thereby forced her to withdraw from his house and family.

A bill of particulars was filed and the respondent made answer to the original libel and the amended libel and the bill of particulars, denying the charges alleged. A master was appointed and hearings had. Those hearings were

416

never completed, for, as the master finds, "at the conclusion of libellant's evidence as to her residence, the master felt some doubt as to the jurisdiction of your honorable court to adjudicate the case and accordingly requested counsel for both parties to furnish him with briefs upon the question of jurisdiction. It was further agreed by counsel, with the approval of the master, that no further testimony upon the merits should be taken until the jurisdictional question should have been disposed of." After the consideration of the testimony and the briefs submitted, the master came to the conclusion that the court was without jurisdiction, and if such conclusion should not be approved by the court, he suggested that the case should be referred back to take further testimony upon the merits. The respondent offered no testimony.

We do not commend this method of procedure, for the reason that the Commonwealth at all times is an unnamed interested party, and although the parties themselves might be bound by final determination as to jurisdiction, the court feels there might be testimony produced in some cases setting forth a state of facts which again might raise the question of jurisdiction and a former adjudication would not be binding on the Commonwealth.

The master filed his report on June 30, 1927, to which the libellant has filed exceptions, which are now before the court. After the master's original report had been prepared, he received from counsel for the libellant a request for findings of fact and a conclusion of law, which he filed at the same time in a supplementary report, on which we have separately passed, and are as follows:

"1. Respondent resided in Montgomery County from 1914, when the family home was bought, and continued residence there until 1924, when the property was sold. Then he took up his residence again in Philadelphia County and still resides there." This request we affirm.

"2. There was not a definite breaking of the marital relation until this action was begun. Early in May, 1926, libellant appears to have resolved that she would take legal proceedings against her husband for ill-treatment committed toward her, and the present action seems to be the outcome of that purpose." This request we deny. The final "farewell" was said on said date, but there is no evidence that she then contemplated legal proceedings.

"3. The libellant has been connected by every ordinary tie to Pennsylvania, including the houses successively in which she lived, the residence of her husband, blood relations in general and property interests, and has had no connection with any other state, tending to constitute residence, except stay in California, in two periods, pending the marital relation, under the circumstances of such stay shown in the evidence. Only so far as these imply was her connection with Pennsylvania changed up to date of institution of this action." This request we deny.

"*Conclusion of law.* 1. If cause for an action of divorce, such as is defined by Pennsylvania law, by the present libellant against the present respondent existed in May, 1926, she was then entitled to resort to a court of this state for such redress." This is denied. Action for divorce was not instituted until Oct. 16, 1926, but as she had acquired a residence in the State of California between May, 1926, and Oct. 16, 1926, she was not entitled to redress in this state.

*Findings of fact by the court.*

1. Libellant and respondent were married in Philadelphia, Jan. 27, 1897, by Father Toomey in the Church of the Immaculate Conception, and at the time of their marriage were residents of Philadelphia.

2. Libellant was born Aug. 14, 1872, and the respondent March 25, 1867, both at Philadelphia, and resided there continuously until the time of their

marriage. The respondent was a practicing physician, an eye specialist, with offices in Philadelphia.

3. After the marriage they lived in Philadelphia for a period of seventeen years, and in 1914 moved to Bryn Mawr, Montgomery County, Pennsylvania; and in 1919 together took a trip to California and remained there for two years, when the husband returned, apparently some time in 1920, the wife remaining.

4. The wife returned to the Bryn Mawr domicile about September, 1921, and remained until August, 1922, when she again went to California and remained in California continuously up to the present time, except for a period from Sept. 24, 1926, to Oct. 26, 1926, when she temporarily lodged at a hotel in Philadelphia for the purpose of instituting these proceedings.

5. The husband visited his wife and family every summer while they were in California during the period between 1922 and 1926, and after the house at Bryn Mawr was sold in 1924 he visited them for a period of two months and returned and took up his residence at the Pennsylvania Hotel in Philadelphia and afterwards at the Union League.

6. In 1925 the parties contemplated making a home in California, to find a house and give up Philadelphia as their residence, but that plan was never consummated.

7. The husband had made reservations in January, 1925, for the family to go abroad in June and travel in Europe for two or three years, but the daughter broke down and was physically and mentally unable to go, and the trip was abandoned.

8. In 1924, while in California, the wife and husband planned to live in the Locust Street house in Philadelphia, which she owned, and architects were consulted about plans, and they had contemplated moving in the fall. However, by reason of a dispute, this never materialized.

9. The libellant separated from her husband May 2, 1926, and said farewell to him in San Diego, California.

10. During her last four years' stay in California they communicated concerning business matters, and she executed a power of attorney in favor of respondent, and trusted him with large sums of money belonging to her.

11. Her stay in California benefited her health and that of her daughter, one or the other of them being under a doctor's care at different periods.

12. The father of the libellant has left a trust fund of $400,000, under the control of the Orphans' Court of Philadelphia, for her maintenance and support; and she had continuously a bank account in Philadelphia with the Girard Trust Company while she was in California.

13. Her husband assisted her in making out her income tax return for the several years while she was in California, and stated her residence as No. 1507 Locust Street, Philadelphia, the house which libellant owned.

14. The residence and domicile of the respondent during the period of his entire life, except from 1914 to 1924, when he lived in Montgomery County, Pennsylvania, has been Philadelphia. He has always been a resident of Pennsylvania.

15. There were five children born of this union—Bernard, twenty-nine years of age, who lives in Paris, France; Charles, twenty-five years of age, living in Paris; Bryant, twenty-two years of age, living in Paris; Catherine and Dorothy, twin girls, twenty-one years of age, Dorothy being at school in Chestnut Hill, Philadelphia, while Catherine lives with her mother in California.

16. On her second trip to California, when she left Aug. 15, 1922, it was with her husband's consent, and he consented to her remaining there from

said date up to May 2, 1926, when libellant considered that the husband's conduct was such that she severed marital relations. On said date, Aug. 15, 1922, she had intended not to return to any domicile owned by her husband, but this intention was never disclosed to her husband, and from the bill of particulars filed they had lived together in the years 1923 and 1925 in California, and the respondent in his answer admits the wife's coverture.

17. From May 2, 1926, to Sept. 24, 1926, she continued to live in California, after which last date she resided at the Bellevue-Stratford Hotel in Philadelphia until Oct. 26, 1926. She filed her libel while a guest in said hotel to the above court on Oct. 16, 1926, and her visit to Philadelphia was for the purpose of instituting an action in divorce. She immediately returned to California, where she remained until April, 1927, when she came to Philadelphia to attend the hearing as a witness.

18. On May 2, 1926, when the final break took place, and immediately thereafter and previous to the filing of the libel, the libellant became a resident of and had her domicile in the State of California.

*Discussion.*

The libellant in her libel places her last known domicile in the State of Pennsylvania as that of Bryn Mawr, Montgomery County, "until within four years, during which, though libellant has retained her residence in Pennsylvania, she has no place of continuing abode there, having been temporarily absent from the state."

In her testimony, the libellant evasively fixed her home in Pennsylvania as No. 1507 Locust Street, Philadelphia, the house which she owned.

In her brief submitted, she now fixes her home in the State of Pennsylvania in the County of Philadelphia, because her husband resided in said state and county and it was her residence during coverture up to the time of the separation on May 2, 1926.

Her brief reads: "We do not stop to consider the question whether this action should be brought in the courts of Montgomery County, since both husband and wife last resided there before she went away, because (1) if her husband's residence in Pennsylvania maintained herself in this state, as we claim it did, a like result was effected as to the county (Philadelphia) to which he moved when he sold his house in Montgomery County. And, furthermore, (2) the Act of April 26, 1905, P. L. 309, paragraph 1, expressly applies, authorizing the filing of the bill in the county where the respondent resides." This latter act has been construed by our court in Ashton *v.* Ashton, 21 Dist. R. 611.

The Act of March 19, 1923, P. L. 20, permits the wife to exhibit her petition to the judges of the Court of Common Pleas of the proper county where she resides, but the averment in the above paragraph of the petition states that she has no continuing abode in the State of Pennsylvania, and her libel fails to show that she is a *bona fide* resident of any county, and her petition, on its face, lacking this jurisdictional fact, should be dismissed: Mauser *v.* Mauser, 59 Pa. Superior Ct. 275.

Assuming, however, that the libellant, when she abandoned her husband in California and severed all marital relations on May 2, 1926, was no longer under coverture and could on that date either claim her husband's residence as her own or adopt a new domicile, she cannot have two residences within the contemplation of our divorce law: Hilyard *v.* Hilyard, 87 Pa. Superior Ct. 1, 5.

"It is well settled that a wife has not only the actual but also the legal right to establish a separate domicile when ill-treated by her husband. A man is lord of the domus only so long as he rules lawfully. When the husband forfeits his right to preside over the home by reason of misconduct, then the wife acquires a legal right to have and to maintain a separate domicile. In other words, the husband's headship over the matrimonial domicile ceases when he violates the marriage laws, and the wife is no longer required to live with or accompany him—even in theory. Under such circumstances, the law of the domicile acquired by the wronged wife will determine her marital status. Of course, to acquire a separate domicile the wife must intend to abandon her husband's home and set up an independent home of her own.

"The words 'bona fide' as used in the Act of 1854 mean an intention to make the residence permanent and not merely temporary. Had the word 'domicile' been used instead of 'residence,' it might have been consistent with nonresidence, but it was not. 'Domicile' is a matter of intention; 'residence' is a physical fact, and the term 'bona fide residence' means residence with domiciliary intent, i. e., a home in which the party actually lives:" Starr v. Starr, 78 Pa. Superior Ct..579, 582, 583; Barning v. Barning, 46 Pa. Superior Ct. 291.

The test on this subject reads: "Notwithstanding the general rule that the domicile of the wife is that of her husband and that during the period of cohabitation she cannot acquire a separate domicile, even with his consent, . . . a wife may acquire a separate domicile of her own for the purpose of conferring jurisdiction on the proper tribunal in a proceeding for divorce, or for separation, where the husband has been guilty of such dereliction of duty in the marital relation as entitles the wife to have it either partially or totally dissolved:" 19 Corpus Juris, § 44, page 31.

To constitute a new domicile two things are indispensable: First, residence in the new locality, and, second, the intention to remain there. The change cannot be made except facto et animo. Both are alike necessary: Barclay's Estate, 259 Pa. 401, 405.

That she actually resided in California at the time when the separation took place there is no dispute. After the separation, was it her intention to stay there? We find with the master that "she actually lived in California continuously from Aug. 15, 1922, until Sept. 24, 1926, not because she was studying or traveling or even visiting friends or relatives in that state, but apparently because she preferred to, since the evidence of her own and her children's illness does not of itself account for so extended a stay. On Sept. 24th she returned to Pennsylvania 'chiefly for the purpose of instituting this action in divorce,' and lived in a hotel until Oct. 26th, ten days after the libel was filed, when she returned to the place in which she had been living in California. Within a month after her return she leased a bungalow for a year, which lease did not expire until Nov. 21, 1927. She remained in California until April 14, 1927, when she came to Philadelphia to testify in the present proceeding, and will doubtless return to California as soon as it is concluded."

On page 53, the libellant testified: "Q. When you returned to Philadelphia in September, 1926, you stated, among other things, that you came here to see about starting these divorce proceedings? A. Yes. Q. Did you have any intention of residing here then? A. I came back to place this girl in school. Q. Answer yes or no, then explain. A. I did not intend to remain then, no. Q. You have a lease on a house or bungalow in California that expires in November of this year, have you not? A. Yes. Q. When did you take that lease? A. I took it in November, 1926." At page 54: "Q. Was it or was it

not within a month after your return from Philadelphia, after commencing these proceedings, that you took a year's lease on a house in California. . . . A. It was about six weeks, I think."

She also testified that she discussed with her real estate agents the sale of her house at Locust Street, Philadelphia, in September or October, 1926.

Her answers as to her residence were evasive. "Q. After the Bryn Mawr property was sold, what place in Pennsylvania was your home? A. I did not have any home in Pennsylvania. I owned this property. Q. I am not asking where your house was, Mrs. Jones, I am asking where your home was—not what house you had. Q. Is there anything you can add to that, Mrs. Jones? A. No. . . . Q. Mrs. Jones, I am not asking you where your house was— where your dwelling was in Pennsylvania after Bryn Mawr ceased to be your home, because the house was sold; what I am asking you is what place in Pennsylvania was the place which you considered you were connected with as the place of your home after the Bryn Mawr property was given up? A. The place that I considered I was connected with was No. 1507 Locust Street. Q. What city? A. Philadelphia. . . . Q. When you referred to No. 1507 Locust Street as a home in Pennsylvania, did you mean that in the sense of a place to live or a place to have mail sent or income tax returns sent? A. I meant it as a place to go in to live. I thought if ever I came back to Philadelphia I had that house idle and I could go right into it. Q. You could go into it? A. Yes. Q. Did you have plans as to whether or not you would go into it, except the plans in 1924, which were not fulfilled? A. No, it was before 1924 we had all the plans made for the alteration. Then Mr. Brockie said it was inadvisable."

The libellant had a continued residence in California for four years and after her separation from her husband she never had any intention of returning to Philadelphia and simply came for the institution of these divorce proceedings, and immediately after the filing of the libel she rented a house in California for another year. No other inference can be drawn from the evidence than that she had determined to continue her residence in California and make that her domicile *in facto et animo*. There is absolutely nothing in the testimony to show that she ever intended to make Pennsylvania her home after the separation, nor was Pennsylvania her home at the time of the filing of this libel, nor was Montgomery or Philadelphia County.

The libellant being at the time of the filing of the libel domiciled in California, she was not, during the year preceding the filing of the libel, such a resident of this state as is contemplated by the acts of assembly; and since residence within the state for that year which immediately precedes the filing of the libel is a fundamental jurisdictional requirement, the conclusion follows that the court is without jurisdiction of the parties: Starr *v.* Starr, 78 Pa. Superior Ct. 579.

### Conclusions of law.

1. The libel on its face does not set forth sufficient facts to give the court jurisdiction.

2. The libellant was not a *bona fide* resident of the State of Pennsylvania for one year prior to the filing of the libel.

### Order.

And now, Sept. 26, 1930, the exceptions to the master's report are dismissed, and the recommendation of the master is approved, and the libel is dismissed.